## Brittain *against* The Doylestown Bank.

The holder of an endorsed note who discovers that the endorsement was forged by the maker, may take from the maker a judgment and sell all his estate by execution and appropriate it to the payment of such note, without thereby discharging the *bonâ fide* endorser of another note given by such maker and in the holder's possession, though he gave no notice to him of his proceedings and did not arrest the maker for the misdemeanor, if there be no evidence of a composition of the offence.

Where a note is payable at a bank, an assertion in the protest of demand at the bank is sufficient *primâ facie* evidence of such demand.

Proof of a delivery of such note by the cashier to the notary for protest on the last day of grace, and presentation by him at the bank on the day following, is sufficient.

But in such case there need be no demand at all, if the endorser has waived notice of non-payment by a memorandum at the time of endorsing.

Where a note is payable at a bank, it need not be shown that the cashier was at the bank all the business hours on the day of payment in order to receive it: the presumption is he performed his duty.

It is no error that the court did not charge on a specified point without any prayer to that effect.

A defect in the narr. is not matter for the court to charge upon.

Nor the weight of evidence in regard to particular facts.

ERROR to the Common Pleas of *Bucks* county, in which an action of *assumpsit* was brought by the Doylestown Bank of Bucks county against Alexander C. Brittain and Samuel B. Brittain, trading under the firm of A. C. Brittain & Co., to recover the amount of two promissory notes for $700 each, made by John Hank payable to the order of the defendants at the Doylestown Bank, and endorsed by them; one dated April 14, 1837, at ninety days, the other May 17, 1837, at sixty days. On both there was an endorsement, signed by the defendants, that as endorser they waived all notice of the non-payment of the note by the drawer, if the same were not paid at maturity. One of the counts did not state the note to be payable at the Doylestown Bank; but the court allowed this to be inserted during the trial. The defendants gave previous notice of special matter.

The plaintiffs gave in evidence two notarial certificates of protest, one dated the 15th of July 1837, of the note of April 14th, the other dated the 19th of July 1837, of the note of May 17th,

[Brittain v. The Doylestown Bank.]

made and signed by M. H. Snyder, notary public. They stated that at the request of the bank he exhibited the original promissory notes to Daniel Byrnes, Esq., cashier, and received for answer there were no funds to meet the payment thereof, and that he had notified the drawer and endorser, by mail, of the non-payment of the notes.

The defendants then called M. H. Snyder, who testified that he did not exhibit the notes to Byrnes or make demand of any one on the date of the protests. On his cross-examination he said he called in the afternoon of the last days of grace and got the notes of Byrnes or the clerk, took them to his office and made out the notices. He was then proceeding to state what he did the next morning, when the defendants objected; but the court overruled the objection and the defendants excepted.

The witness then stated that he called at the bank the next morning with the protests, and made a demand, by the cashier's direction, and left the protest and note with him; that the answer was, " no funds :" that afternoon or the next morning he put the notices in the post-office.

The defendants read in evidence from the Minute Book of the Board of Directors, the proceedings of a meeting of the Board, as follows: " June 28, 1837, Board met at the banking-house this day, being their regular meeting for discount. Present, A. Chapman, president, J. A. Strasberger, John Robbarts, Wm. Stokes, John Blackfan, S. Yardley, M. K. Taylor, M. Thomas. The Board appoint John Robbarts, Mordecai Thomas and Mahlon K. Taylor, a committee to attend to the case of the bank against John Hank. On motion, John Blackfan was added to the above committee."

They also read in evidence the following deed of assignment under seal from John Hank to the plaintiffs, dated the 29th of June 1837 ; and endorsed " not accepted, June 29th 1837."

" In consideration of the debts that I owe and am indebted unto the Doylestown Bank of Bucks county, and for the better security and payment of the same, I, John Hank, of the county of Bucks, do by these presents grant, bargain, sell and assign unto the said bank, all my estate, real, personal and mixed, to be held by the said bank, and out of the proceeds thereof, first, to pay my note endorsed with the name of John C. Parry for $900; second, pay my five notes endorsed with the name of S. D. Ingham, respectively amounting to the sum of $4430 ; third, pay my two notes endorsed with the name of Lewis S. Coryell, respectively amounting to the sum of $600 ; and fourthly, pay all other debts that I owe or may become due to the said Doylestown Bank of Bucks county, and after paying all costs and charges, if there shall be any overplus, to pay the same unto my order."

John Robbarts testified that the committee appointed on the 28th to secure the bank, reported on the 29th, bringing in this

[Brittain v. The Doylestown Bank.]

assignment and laying it before the Board. The report was not accepted, and no minute was made except the endorsement " not accepted." They had discovered the endorsement of John C. Parry on a $900 note drawn by Hank, to be a forgery; and other forgeries of Hank were discovered, amounting, altogether, to $5000. Hank was not at the bank after this discovery. The judgment obtained by the bank against Hank was subsequent to this discovery. On the 30th the witness saw Hank, as the sole committtee of the bank, at his (Hank's) residence. He then proceeded; " I got a judgment bond; all the report I made. I had not much conversation with him. I told him the bank would not accept the assignment. He offered to give any other security I required, and I told him he must give a judgment bond, and he,came that afternoon and gave it. I did not say anything to him in regard to the forgeries, nor he to me. It was not my business to speak to him. I was sent down to procure a judgment bond. He offered the judgment bond. He must have been aware that the bank knew of his forgeries, but not from me. The judgment was given to secure the bank in the debts owed by John Hank — the debts in which there was no endorsement — the forged debts and other debts. I cannot specify the debts without looking over the books. He owed more money to the bank, I think, at that time than this judgment covered. I sent no word to Brittain at that time. I had nothing to do with him then. I don't know that any notice was given by the bank to Brittain of these forgeries. Hank went to Mr Chapman's office. He drew the bond and he executed it. I was along, and I believe Mahlon K. Taylor. I can't say the president saw him that day; it was after the bank hours. Hank went home and I took charge of the instrument. Had no interview at a subsequent day with any of the Board of Directors. Execution was issued shortly after. I don't know Mordecai Thomas knew of the judgment. I presume he knew of the forgeries on the 27th. He lived in the same town with the Messrs Brittains. No arrangement, that I knew of, that Thomas was to receive an order from Hank to receive funds of Hank in Philadelphia. No conversation at the Board on that subject. I think Thomas said he had a claim against Hank. Can't state what he said. I never heard, until recently, that a draft was given by Hank to Thomas. I saw the draft. Thomas showed it to me. I don't recollect its date. Hank made an assignment to some particular creditors some time after the judgment. I saw the assignment after it was executed. I don't know that the bank had anything to do with the assignment. There was no action of the Board touching that assignment. I believe some of the directors knew of it. Mere act of charity it was done. The bank might have known it through me. I was spoken to by Mr Ingham. The assignment was made to Ingham and myself, to secure the hands in the mill, who were poor and many of them females.

v. — 12                    H *

Ingham consulted me about it. I presume his object was to obtain the concurrence of the bank in the assignment. Ingham has it. Accepted by us. The Doylestown Bank did not consult the other endorsers in regard to that assignment. The bank is not in the habit of prosecuting its debtors. Its object was to obtain their debts. We have prosecuted one forgery. I cannot give any particular reason why the bank did not prosecute him. The bank sent to John C. Parry word his name was forged, immediately on the discovery of it by Thomas, or Mahlon K. Taylor. Hank had done a great deal of business with the bank — had borne a good character — a man that Ingham had a great sympathy for, and spoke of him as an honest, industrious man, who had borne a good character. The bank at that time had hopes of getting his debts. I don't recollect of prosecuting more than one for forgery. I don't mean to say that Ingham recommended that we should not prosecute him. I made no report in writing on the subject of Hank's business to the Board."

Being shown a paper purporting to be a report on Hank's business, the witness said: " This is my handwriting. This report was made September 21, 1837. When I said I had made no report, I meant at the time when we were appointed. This report signed by Thomas and myself. I had no knowledge that Thomas had appropriated part of the funds to himself. It was never brought before the Board. I never saw Hank after he gave the judgment bond, except immediately after the judgment given. I went with the sheriff. May have been there and pointed out the goods. Neither the Board nor any of the committee took any step to arrest Hank. It was kept, like other transactions of the Board, secret. I know of no other consideration that induced Hank to give the judgment bond beside this desire to satisfy the bank. We did not accept the assignment, because we considered it not a sufficient instrument to secure us in our debt. " Not accepted" was written on the assignment the day it bears date. I am sure of that. I think the assignment is in the handwriting of Mahlon K. Taylor, one of the directors. I think he was not present when this non-acceptance was written. Thomas was not present. John Blackfan not present. I don't recollect any names present, except those named before. I rather think that this was the note on which the forgery was discovered. The body of the note in the handwriting of the cashier. I think this was offered in lieu of another note of the same amount. I can't say whether the prior note was given up to Hank."

On his cross-examination he stated : " I gave Hank no assurance, that if he would give the judgment or the assignment, he would not be prosecuted; nor do I know that any one ever gave him such assurance, that I heard of. Mr Thomas never received a cent of his debt by the consent of the bank. The fact of the forgeries was communicated to Ingham, Coryell and Parry immediately

[Brittain v. The Doylestown Bank.]

after they were discovered. I don't know that they took any steps to have Hank arrested. I heard he was in the neighbourhood for a week or two after the forgery was discovered. The assignment for the use of the labourers in the mill was of property the execution did not cover."

This assignment was then read in evidence, and was an assignment under seal dated the 1st of July 1837, by John Hank, "to John Robbarts and Samuel D. Ingham, of all the debts which may be due to me from James Kelly, John S. Bryan, Joseph Young, Geo. N. Olcott, and William R. Dickerson, to be applied by the said assignees to the payment of the debts due by me to the labourers in the factory, to be paid them in proportions to the amounts due, respectively."

The witness then stated that the amount received was $169, and the amount of labour done $366.76. This was paid them *pro rata*. The bank never had possession or control of the property assigned. The subject of this assignment never came before the Board. The statement made to witness by Ingham was never presented to the bank. Witness became an assignee at Ingham's request.

The defendants proved by Byrnes, the cashier, the seven forged notes, which had been discounted, and purported to be made by Hank, and endorsed, five by S. D. Ingham and two by L. S. Coryell, dated the earliest on the 28th of April 1837, and the latest on the 10th of June 1837. The earliest that became due was the July 2d and 5th 1837; and on the 28th of June a note of Hank's for $900, purporting to be endorsed by John C. Parry, was offered for discount to the bank, but refused, the endorsement being discovered to be a forgery.

2. The plaintiffs offered to examine the witness touching the protest of the two notes in question. The defendants objected, but the court overruled the objection, and the defendants excepted.

The cashier proved that he was at the bank the last day of grace until it closed, and Hank had no funds there.

Samuel D. Ingham testified that it was by his influence Hank assigned his debts for payment of the labourers, they not being included in the execution, and that it was done with the assent of the bank. The amount received was $169.10, leaving $187.66 still due these creditors. Mordecai Thomas, one of the directors, testified that he obtained a draft from Hank on M'Gargy & Co. for his private debt; but it was not accepted or ever paid by them or any other person, Hank being in debt to M'Gargy & Co. when he went off. Some other parol evidence was given as to declarations of Thomas.

3. The defendants then offered to prove the declarations of Hank, that if he had not given the judgment to the Doylestown Bank, he would have been thrown into prison, and that he did not know what he was about; that he said the bank agreed to give him time

[Brittain v. The Doylestown Bank.]

to finish and complete his paper, and that in violation of that agreement they had sent the sheriff and levied. This evidence was objected to by the plaintiffs; the court overruled it, and sealed an exception.

4. The defendants again offered in writing to prove that Hank told Samuel Walton that the bank in the first place made him make an assignment to them, and afterwards came to him and told him he must give them judgment, or they would put him immediately in prison. They told him if he would confess judgment, they would give him time to finish his unfinished paper and work up the balance of his stock, and make the best of it; and he said he was so frightened, he did just as they told him. They then sent the sheriff down immediately, and made a levy on all his property, and sold it at a great sacrifice; and that after they got the judgment, they would not give up the assignment. He said it would have been his wish to have made a fair dividend among all his creditors; but the bank told him he must do one thing or the other—give them judgment, or go to prison immediately. He said he did not know what the effect would be if he went to prison; that he was frightened by them so, that he did not know what else to do, and hardly knew what he did do. That Walton knew nothing of the forgery at the time, and did not know what Hank meant, when he said he did not know what the effect of going to prison would be. This evidence was objected to by the plaintiffs; the court overruled it, and sealed an exception.

It further appeared that the judgment of the bank against Hank was entered up on the 1st of July 1837, on a bond and warrant dated June 30th 1837, in the penal sum of $12,133.14, conditioned for the payment of $6066.57 with interest on demand. The goods sold on the execution amounted to $3482.76. Out of this were deducted, costs $130.79, and rent paid S. D. Ingham $1461.82; the balance, $1890.15, was paid to the bank.

The plaintiffs also gave evidence by consent to show that in the original transaction of these notes the defendants received the money or consideration of the notes.

The defendants requested the Court to charge upon the following points:

1. That the plaintiffs having rested their case on the certificate of the notary public, no other evidence can be offered, either to establish a demand or to waive the necessity of making a demand.

2. That where a note is protested, the only evidence that can be received by the laws of this State of a demand, is that of the notary himself.

3. That the evidence of the cashier of the bank, without the production of the books of the bank, that there were no funds to meet the notes, is not sufficient evidence of a demand.

4. That after the notary had given in evidence that he made no demand at the bank on the last day of grace, no recovery can be

[Brittain v. The Doylestown Bank.]

had, unless the plaintiffs have proved that John Hank was not at the bank on that day; and that the evidence which has been offered by the cashier as to his being at the bank, and that there were no funds to meet it on that day, is not sufficient in law to dispense with the proof contained in the first part of this proposition.

5. That any demand made at the bank after the last day of grace is not in accordance with the law, and will not entitle the plaintiffs to recover.

6. That the cashier not being able to swear positively that he was at the bank the whole day during banking hours, it was incumbent on the plaintiffs to have called the cashier and clerk, and other officers, to prove that Hank had not been there on that day, to entitle them to recover.

7. That if the jury believe that when Hank gave the judgment to the bank, it was the understanding between him and the parties that he was to be discharged from all liability to the plaintiffs on account of the forgeries, then no recovery can be had.

8. That if the jury believe that at the time the said judgment was given, it was obtained from him through fear of prosecution for forgery, no recovery can be had.

9. That if the jury believe that the understanding between the bank and Hank, at the time the judgment was given, was that he was not to be held liable on account of his indebtedness to the bank, then the defendants are discharged from liability.

10. That if the jury believe that the bank agreed that Hank might leave the county, without molestation or suit on their part, then the defendants are discharged.

11. That if the jury believe the judgment was given by Hank and obtained by the bank in order to avoid a prosecution for his forgeries, it was then fraudulent and void, as well as all proceedings under it; and in such case the bank has funds that ought to be applied to the payment of these notes.

12. That the other creditors of Hank had an interest in the assignment, and it was a fraud upon the endorsers of Hank for the bank to suppress and conceal it, as is proved in the cause. That the assignment was a good and valid one, as between the bank and the present defendants, and continues so to be, and the bank had no legal right to suppress it, but were bound to carry it into effect: and as they did not do it, they are bound to account to the defendants, which they have not done.

13. That the assignment being made under the authority of the bank, was accepted by them, and all other acts in derogation of that assignment, were frauds on the creditors, and on the assignment.

14. That Hank and the committee of the bank, under the authority of the bank, having made and accepted the assignment, the bank had no power without the consent of Hank to abrogate that instrument, and no such consent of Hank is shown.

15. That the assignment being thus valid, it was a fraud on the

[Brittain v. The Doylestown Bank.]

creditors to take a judgment, and proceed to sell Hank's property by the sheriff.

16. That the whole evidence in the cause may be submitted to the jury, to show a fraudulent design on the part of the bank to defeat the creditors under the assignment for their own benefit, and that they therefore cannot recover in this suit.

17. That it is a question of fact for the jury, whether the creditors under the assignment were not defeated of their debts by the acts of the plaintiffs, and, if so, the plaintiffs cannot recover.

18. That if the jury believe from the evidence, that the assignment was accepted, and Hank was induced by promises or threats to agree to abrogate it, such agreement was void.

The court charged as follows:

This action is brought to recover the amount of two promissory notes, drawn by John Hank and endorsed by the defendants. The notes were payable and discounted at the Doylestown Bank of Bucks county. You have heard how notice was given of their dishonour. The reason why the law requires that the endorsee of a note or bill shall give notice to the endorser of non-payment, is, that he may take the necessary measures to obtain payment from the party or parties respectively liable to him. But the endorser may waive the want of notice; and on these notes the endorser signed a printed memorandum—"as endorser, I waive all notice of the non-payment of this note by the drawer, if the same shall not be paid at maturity." But these notes were protested for non-payment on the last days of grace. The cashier of the bank swears he was in the bank on that day to receive payment, and on that day he handed them to the notary for protest— no person appearing to make payment, the drawer of the notes being without funds in the bank. The notary swears he protested the notes on that day, and put notices in the post-office; sometimes sent them there. The defendants contend there is not full proof of demand at the bank by the notary on the last day of grace; that none but the notary can make the demand; and that the cashier of the bank must prove he was there the whole day, ready to receive payment. You will observe these notes were payable at the Doylestown Bank. Now the law is well settled in Pennsylvania, that when a promissory note is payable at a particular place, such as a bank, and on a particular day, and the endorsee is at the bank until it closes, at the usual hour on the day on which the note falls due, ready to receive payment, no further demand on the drawer is necessary in order to charge the endorser. 1 *Rawle* 335. These grounds taken by the defendants are not, in the judgment of the court, sustained either on principle or authority. It is conceded a protest is not necessary to charge the endorser. Notice of non-payment to the endorser is the essential matter. Here the endorser waived the want of notice; but if there had been no waiver, the testimony is ample to show he had such notice as the law requires. Notice put in the post-office by

[Brittain v. The Doylestown Bank.]

the notary, directed to a post-office nearest the endorser's residence, is held sufficient.

We proceed to consider the other grounds in this cause. The 28th of June 1837 was a regular discount-day of the bank. A note of John Hank, purporting to be endorsed by John C. Parry, came before the board. It had been deposited in the bank on the 24th, to meet a prior note of Hank's, that became due on that day. The note had been examined by the president of the bank, and passed by him, and the note due on the 24th delivered up to the drawer, Hank. The endorsement on the note was discovered to be a forgery. Hank had other notes in bank, purporting to be endorsed by Ingham and Coryell. These were also discovered to be forgeries. These forgeries amounted to about $6000. The bank was alarmed, and appointed a committee to attend to the business of Hank. The committee met Hank, and he gave them an assignment of his property. They reported to a special meeting of the Board the next day. The Board rejected the assignment, and so endorsed upon it, and appointed a committee, who immediately went to Hank and procured a judgment bond for the amount of the forgeries, and some interest due the bank. This judgment was entered on the 1st of July, and an execution issued. His property was sold to the amount of $3482.76. The costs were $130.79. Ingham's rent amounted to $1461.82, making $1592.61, which left for the bank $1890.15; not one-third of their debt. You have the forged notes in evidence. One of them fell due on the 2d and 5th of July for $1400; others fell due in July, others in August, &c. The sale took place on the 13th of July 1837, on the execution. The notes in question, endorsed by the defendants, fell due after this time; the first on the 15th of July, and the other on the 19th of July, 1837.

The defendants contend this was a valid assignment, and the bank had no right to reject it; that they were bound to carry it into effect, and to account to the defendants in this action, which they have not done. To these positions the court do not subscribe. When the committee of the bank reported to the Board what they had done, the Board had a right to accept or refuse it. They did refuse it, and endorsed their refusal upon it, " not accepted, 29th June 1837," and as soon as practicable advised Hank thereof, and obtained the judgment as before stated. From the evidence before the court, it is manifest that if the bank had accepted the assignment, no part of the effects of Hank would have come to the defendants, because, by the assignment, the bank was

1. To pay the note endorsed by John C. Parry,..................$ 900.00
2. To pay the five notes endorsed with the names of S. & D. Ingham,  4430.00
3. To pay his two notes endorsed with the name of Lewis S. Coryell,  600.00

                                        $5930.00

Add to this Ingham's rent, which would have been collected, ....  1461.82

                                        $7391.82

[Brittain v. The Doylestown Bank.]

And these sums were to be paid before any part of his property would reach the other debts due the bank. The only evidence of assets we have beyond the sales, which amounted to $3482.76, was the pittance which the labourers got through the interference of Ingham, of $169.10, and some little property in the house, which the labourers got, that was exempted under the poor-laws. If the bank had taken the assignment, here was the sum of near $4000, beyond the assets in evidence, to be made up before any of those assets could be carried to the credit of the defendants. You will bear in mind that the notes in question did not become due until after the sale. When the bank discovered the imposition and forgery committed upon them, it was their duty to take all legal means to secure their debt. That was their first duty. They had a right to obtain a judgment, to enter it up and sell Hank's property. But it is contended that they fraudulently obtained this judgment. Fraud is odious, never to be presumed. To establish it, facts and circumstances must be proved, from which a jury may fairly collect it. It seems to the court that a fair construction of the evidence negatives any agreement not to prosecute. In answer to a question put to Robbarts by the defendants, who called him, he swears, " I saw Hank on the 30th. I saw him on that day at his residence in Solebury township. I saw him at the instance of the Board of Directors, and got a judgment bond. I had not much conversation with him. I told him the Board would not accept the assignment. He offered to give any other security I required, and I told him he must give a judgment bond, and he came that afternoon and gave it. I did not say anything to him in regard to the forgeries, nor he to me. It was not my business to speak to him. I was sent down to procure the judgment bond. He offered the judgment bond. He must have been aware of the forgeries, but not from me." And in his cross-examination he swears: " I gave Hank no assurance that if he would give the judgment or the assignment, he would not be prosecuted, nor do I know that any ever gave him such assurance." Where then is the evidence that the bank fraudulently obtained the judgment? It would seem to the court that the facts in the cause, instead of affirming fraud, negative the commission of fraud. The bank might, or might not, prosecute. If they entered into an agreement not to prosecute, we agree it would have been a most improper act; and if it prejudiced the defendants, it would affect the bank to the extent of the injury the defendants sustained.

The first six points of the defendants have been fully answered, so far as they apply to this case. We have instructed you, that as these promissory notes were made payable at the Doylestown Bank of Bucks County, and on a particular day, and the bank open and the officers there on the day the note fell due, ready to receive payment, no further demand was necessary in order to charge the endorsers. In Massachusetts, it has been held that by the endorse-

[Brittain v. The Doylestown Bank.]

ment of a note payable on a day certain at a bank, the endorsers guarantee that on the day of payment, the maker would be at the bank and pay the note, and if he did not pay it there, he would be answerable for the amount on notice. Here the endorsers had waived notice in writing. You have heard how notice was given, and how the notes were protested. Upon examining Chitty, we think that when a note is payable 60 or 90 days *after date*, the law is, that the day the note is dated is not to be counted. When a note falls due on Sunday, that is, Sunday the third day of grace, it is to be protested on the Saturday preceding.

The 7th, 8th, 9th, 10th and 11th points are fully answered in our general charge, so far as they apply to this case. We will merely add, that the judgment was not taken to secure the notes in question, which were not then due, but to secure payment of the forged notes. We have instructed you the bank had a legal right to do so, by fair and legal means; that if the testimony of Robbarts is believed, which we have already remarked on, it goes strongly to negative fraud. We agree that if the evidence would warrant the conclusion that the bank did a wrong act, which affected the Brittains, they would be entitled to relief to the extent of that injury.

We consider the 12th, 13th, 14th, 15th, 16th, 17th and 18th points as fully answered in our general charge. We have instructed you that the Board of Directors had a right to refuse to accept this assignment. They did refuse. We do not think their refusal was a fraud on the creditors of Hank—to reject this assignment and take a judgment bond, nor to proceed and sell the property. This court, in the discharge of their duty, cannot instruct the jury to draw conclusions from facts which do not exist in the cause, or are negatived by the facts given in evidence. We therefore cannot instruct you as required in these points. A great deal has been said about the bank permitting or allowing Thomas to get an order from Hank on M'Gargy. The evidence is, that M'Gargy never accepted the order, and he swears that Hank, when he went off, was $200 in his debt. If the bank makes a gratuity to Thomas, I do not see, under the circumstances of this case, that *that* will help the defendants.

A verdict and judgment were rendered for the plaintiffs. The defendants excepted to the charge, and assigned the following errors:

1. The court erred in admitting the evidence in the 1st and 2d bills of exception.

2. In overruling the evidence in the 3d and 4th bills of exception.

3. In charging the jury that these notes were protested for non-payment on the last days of grace.

4. In that part of their charge wherein, after stating to the jury that " the defendants contend there is not full proof of demand at the bank by the notary on the last day of grace; that none but

[Brittain v. The Doylestown Bank.]

the notary can make the demand, and that the cashier of the bank must prove he was there the whole day, ready to receive payment," they say, " these grounds taken by the defendants are not, in the judgment of the court, sustained either on principle or authority."

5. In charging the jury, " Here the endorser waived the want of notice ; but if there had been no waiver, the testimony is ample to show he had such notice as the law requires.    Notice put in the post-office by the notary, directed to a post-office nearest the endorser's residence, is held sufficient."

6. In not charging the jury upon the defendants' first six points ; and if any part of the charge can be considered an answer to those points, there was error in such answer.

7. In assuming to themselves the determination of the facts which had been given in evidence, to prove that such a demand of payment had been made as the law required, and that notice of the dishonour of the bills had been given to the endorsers.

8. In their charge to the jury on that branch of the case which related to obtaining the judgment from Hank, when they said that " it seems to the court that a fair construction of the evidence, negatives any agreement not to prosecute ;" and also, " it would seem to the court that the facts in the cause, instead of affirming fraud, negative the commission of fraud."    The court should have submitted the evidence on this point to the jury for their determination, and it was error not to do so.

9. In not submitting to the jury, as requested in the 16th point, the whole evidence in the cause, to show a fraudulent design on the part of the bank to defeat the creditors under the assignment for their own benefit ; and in not charging the jury that, if they believed such to be the fact, no recovery could be had.

10. In their answers to the 7th, 8th, 11th, 12th, 13th, 14th and 15th points of the defendants.

11. In not giving any answers in their charge to the jury on the 9th and 10th points.

12. In not charging as requested in the 17th and 18th points.

13. In charging the jury that if the bank made a gratuity to Mordecai Thomas, out of the funds assigned to them by Hank, it would not, under the circumstances of the case, help the defendants.

14. They should have charged the jury, that any actual or permissive diminution by the bank of the fund assigned to them by Hank, or which was within their power or control, discharged his endorsers.

15. The court erred in permitting the amendment to the narr. to be made.

16. In not charging the jury, that as the notes were drawn payable at the Doylestown Bank, the plaintiffs were bound to have averred in their narr. a presentment at the place for payment ; and not having done so, no recovery could be had.

[Brittain v. The Doylestown Bank.]

17. In not charging the jury, that, under the pleadings, the evidence does not entitle the plaintiffs to recover.

19. In not submitting to the jury, whether there had been a delivery by Hank and an acceptance by the bank of the deed of assignment of June 29th 1837.

*Ross* and *J. Fox*, for plaintiffs in error.
*Chapman* and *M'Dowell*, contra, were stopped by the court.

The opinion of the Court was delivered by

Gibson, C. J.—Notwithstanding the multiplicity of these exceptions, few of them present any tangible surface; and we are compelled to restrain our notice of them to those that are susceptible of particular examination.

The judgment obtained by the directors from Hank, was said to be collusive. Against whom? Certainly not against his endorsers, who had no lien or particular claim on his effects. There can be no collusion where there is a *bonâ fide* debt to be secured; and the bank, holding other notes drawn by him, on which the endorsements were discovered to have been forged, did what? Took measures to secure itself, without having given the actual endorsers notice of his delinquency, and without having had him arrested. Well, they were not bound to give notice, or to take care of the endorsers, whose business it was to take care of themselves. But they kept the matter secret till they had obtained the first security, and the drawer had fled. What then? They were not bound to arrest him, or to publish their doings, or to consult the other creditors. An endorser is taken for the very reason that the drawer's property may perhaps be insufficient, and that the endorser's property may be added to it; but that gives the endorser no right to come upon the drawer's effects in preference to the holder, in regard to another debt, by insisting that the holder shall take satisfaction of the debt secured by endorsement, out of the effects in the first instance. With regard to debts not thus secured, the endorser and the holder stand on the same footing as any other creditors; between whom, everything depends on superior vigilance in obtaining the first security, in a scramble where each must shift for himself. The holder, therefore, like any other creditor, may lay hold on all the drawer's property, where he can do so by legal means. The exception to the means, in this instance, is that the consideration of the judgment, as it is said, was the composition of a misdemeanor; of which, however, there was not a spark of evidence. The other objection, that the bank was bound to take Hank's assignment, is destitute of all plausibility. The directors had a right to elect the judgment as a preferable security, and insist on having it.

The protest contains an assertion of demand at the bank, which, *primâ facie*, was certainly sufficient. The notary, however,

[Brittain v. The Doylestown Bank.]

testified that he had made no actual demand, but that the notes were handed to him for protest by the cashier on the last day of grace; and that he presented them for payment the day following. But what necessity was there for a demand when funds were to have been provided at the bank, and when the endorser had waived notice of non-payment by a memorandum on the note at the time of endorsing it? The interpretation is that he agreed to become immediately liable, without more, in case the note should not be taken up by the drawer at its maturity. There was no need of positive proof that the cashier was at the bank during all the business hours on the day of payment, in order to receive it; for the presumption is that he performed his duty, and it accords, too, with the usual course of transactions.

Most of the remaining exceptions relate to the weight of the evidence in regard to particular facts; which is not a subject of legal direction, and consequently not of error. Some of them, too, relate to what it is supposed the judge ought to have charged, even without a prayer for specific direction to call his attention to the subject; and for this also he is not responsible. It is even alleged that he ought to have made a defect in the declaration a subject of direction, though the jury had nothing to do with it. This mode of assigning errors may prolong an argument, by complicating the details, and give unnecessary trouble; but it can do the plaintiff in error no good.

Judgment affirmed.